IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:16-CV-132-FL

| | | |
|---|---|---|
| DAVID CHRISTOPHER JUSTICE and LISA JUSTICE, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | ORDER |
| GREYHOUND LINES, INC. and J.L. ROBINSON, | ) ) ) ) | |
| Defendants. | ) | |

This matter is before the court on defendant's motion for partial summary judgment (DE 37). The motion has been fully briefed, and in this posture the issues presented are ripe for ruling. For reasons noted, the motion is granted.

## STATEMENT OF THE CASE

On December 24, 2014, defendant J.L. Robinson ("Robinson") was driving a passenger bus in the course of his employment with defendant Greyhound Lines, Inc. ("Greyhound") along the route from Atlanta, Georgia, through Raleigh, North Carolina, to Richmond, Virginia. On the same day, plaintiff David Christopher Justice ("David") was working as a North Carolina Highway Patrol trooper in the area of Interstate 40/85 ("I-40/85") near Mebane, North Carolina and near mile marker 155. David was called to that area to respond to a traffic accident, and, in the course of his response, David parked his marked Chevrolet Tahoe in the eastbound lane of I-40/85. Just after 10:00 a.m., the bus Robinson was driving crashed into David's Tahoe, injuring David.

Plaintiffs initiated this action in the General Court of Justice, Superior Court Division for Wake County, North Carolina February 17, 2016. Defendants removed the action to this court on the basis of diversity jurisdiction March 28, 2016. In the first claim for relief, plaintiff David seeks compensation for his injuries. In the second claim for relief, plaintiff Lisa Justice ("Lisa"), David's wife, seeks compensation for loss of consortium. In the third claim for relief, hinged upon plaintiffs first and second claims, and as repeated in paragraph three of the prayer for relief, plaintiffs seek punitive damages premised upon allegation that actions of either or both defendants were willful or wanton. Plaintiffs seek recovery on all claims against both defendants.

After a period of discovery, defendants filed the instant motion for partial summary judgment directed against plaintiffs' asserted entitlement to punitive damages. In support, defendants rely upon depositions of plaintiff David, defendant Robinson, Michael Maddox, and Ernest Warren ("Warren"); Rule 30(b)(6) deposition of defendant Greyhound given via Paulette Banks and Alan Smith; and training materials used by Greyhound including Greyhound's 2014 Fall "Stay Sharp" classroom materials, Greyhound safety bulletins, and "Prepared for Work" policy. In opposition, plaintiffs rely upon the same evidence, and, in addition, Robinson's daily logs and calculation of driving hours; a vehicle examination report created by the North Carolina State Highway Patrol; expert report of William Kluge; an affidavit executed by Warren; excerpts from Robinson's personnel file; an onboard video captured by cameras mounted in the bus; and a transcript of Robinson's guilty plea in a related criminal matter to charges of failure to reduce speed, reckless driving to endanger, and failure to move over for a stopped emergency vehicle causing injury.

**STATEMENT OF THE UNDISPUTED FACTS**

The undisputed facts viewed in the light most favorable to plaintiffs may be summarized as follows. On December 24, 2014, a series of traffic accidents occurred on eastbound I-40/85, which required emergency assistance. (Defs.' Ans., DE 7 ¶ 10). On that day, plaintiff David arrived at the scene in his marked North Carolina State Highway Patrol Chevrolet Tahoe. (DE 39 ¶ 1). David parked his Tahoe in the far right lane. (Id. ¶ 2).

That same morning, defendant Robinson, in the course of his employment with defendant Greyhound, was driving a Greyhound bus on the route from Atlanta, Georgia, through Raleigh, North Carolina, to Richmond, Virginia. (DE 7 ¶ 17). Just after 10:00 a.m., as the bus neared Mebane, North Carolina, Robinson was traveling in the far right lane of eastbound I-40/85, and crashed into David's Tahoe. (Id. ¶ 25).

The posted speed limit at the accident scene was 65 miles per hour. (DE 7 ¶ 26). At the time of accident, defendant Robinson was speeding by driving with cruise control set to 68 miles per hour. (Banks Dep., DE 44-2 at 57:21). In its internal review of the accident, defendant Greyhound assessed that the accident was preventible, and that factors including road conditions, weather, speed, and other distractions contributed to the accident. (Id. at 50:22–24). In adverse weather conditions, Greyhound's "standard is to decrease speed by 25 percent" relative to the posted speed limit. (DE 44-3 at 36:16–21).

Although defendants concede that weather conditions contributed to the accident, defendants do not concede specifically that it was raining nor that defendant Robinson was driving too fast for conditions. Upon the court's review of the dash cam video, which captures the moment of accident itself and approximately 10 seconds before and after, it is readily apparent from observable total

cloud cover and obvious presence of water droplets on the camera lens that it was raining either at the time of accident or shortly before, but the video's resolution is limited and the camera partially is obfuscated by water droplets. (See DE 44-15). Although Banks states at deposition that defendant Robinson informed her of "heavy rains[,]" Banks's discussion of Robinson's account of the weather does not disclose any specific admission by Robinson that it was raining at the time and location of accident. (DE 44-2 at 50:14–17). No discussion of rain appears in excerpts of Robinson's deposition testimony presented to the court. (See Robinson Dep., DE 40-4; 44-4).

At the time of accident, defendant Robinson was driving in violation of a rule promulgated under the Federal Motor Vehicle Carrier Act ("FMCA") limiting driving time for a commercial bus driver to no more than 70 hours in any eight-day period ("70-hour rule"). (DE 39 ¶ 5). Robinson's violation of the 70-hour rule is traceable to a mathematical error entered on Robinson time log December 4, 2014, whereby Robinson failed to record 3.75 hours of driving. (Id. ¶¶ 6, 7). Robinson was not in violation of another rule promulgated under the FMCA regulating the number of driving hours allowable in a single day. (DE 43 ¶ 10).

Finally, defendant Greyhound requires all drivers to undergo fatigue management training at least every two years, and Greyhound maintains a program called "Stay Sharp" that addresses driver fatigue. (DE 43 ¶ 12). Greyhound has prepared a "Prepared for Work" policy and issues safety bulletins to its drivers that also address fatigue issues. (Id. ¶ 14). Defendant Robinson had undergone his bi-annual "Stay Sharp" training in October or November of 2014. (Id. ¶ 15). Greyhound receives periodic reports on the rate of accuracy of its driver's logs, which disclose consistently that more than 99 percent of driver logs accurately reflect a driver's hours. (Id. ¶ 16).

4

# DISCUSSION

A.     Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotation omitted). Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.   Analysis

Under North Carolina law, "punitive damages may be awarded . . . to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similar wrongful acts." N.C. Gen. Stat. § 1D-1. "Punitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages and that [fraud, malice, or willful or wanton conduct] was present and was related to the injury for which compensatory damages was awarded[.]" Id. § 1D-15(a).

"The claimant must prove the existence of [fraud, malice, or willful or wanton conduct] by clear and convincing evidence." Id. § 1D-15(b). "The clear and convincing standard requires evidence that should fully convince." Scarborough v. Dillard's, Inc., 363 N.C. 715, 721 (2009) (internal quotations omitted). In the context of punitive damages, "whether the evidence is clear and convincing" is not solely a question for the jury. Id. Rather, "courts must determine whether the [plaintiff] produced clear and convincing evidence from which a jury could reasonably find [willful

6

or wanton conduct]." Id. at 721–22 (emphasis added). "Evidence that is only more than a scintilla cannot as a matter of law satisfy that nonmoving party's threshold statutory burden of clear and convincing evidence." Id. at 722.

In the instant matter, plaintiffs assert no fraud or malice; rather, they claim entitlement to punitive damages based upon defendants' alleged "willful or wanton conduct." " 'Willful or wanton conduct' means the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm."

"Traditionally, under North Carolina law, the North Carolina Supreme Court has often used the terms 'willful and wanton conduct' and 'gross negligence' interchangeably to describe conduct that falls somewhere between ordinary negligence and intentional conduct." F.D.I.C. ex rel. Co-op Bank v. Rippy, 799 F.3d 301, 314 (4th Cir. 2015) (quoting Yancey v. Lea, 354 N.C. 48 (2001) (internal quotation marks omitted). However, in the context of determining availability of punitive damages, " '[w]illful or wanton conduct' means more than gross negligence[,]" Id. § 1D-5(7); see F.D.I.C., 799 F.3d at 315 ("[T]o the extent that the enactment of N.C.G.S. § 1D–5(7) signaled the abrogation of the common law definition of gross negligence, it did so only in the context of cases where a plaintiff seeks punitive damages.").

No decision of which the court is aware addresses the distinction, instituted by N.C. Gen. Stat. § 1D-5(7), between gross negligence and willful or wanton conduct as it applies to determining availability of punitive damages. To illuminate the distinction, it is useful to consider the traditional definition of gross negligence as a starting point. This court has defined "gross negligence" outside the context of punitive damages as follows:

Under North Carolina law, "gross negligence" is defined as willful or wanton conduct "done with conscious or reckless disregard for the rights and safety of others." F.D.I.C. *ex rel.* Co-op. Bank v. Rippy, 799 F.3d 301, 314 (4th Cir. 2015) (citing Yancey v. Lea, 354 N.C. 48, 52 (2001)). An act is willful "when it is done purposely and deliberately in violation of law or when it is done knowingly and of set purpose, or when the mere will has free play, without yielding to reason." Foster v. Hyman, 197 N.C. 189, 191 (1929) (internal citations omitted). Similarly, "[a]n act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." Yancey, 354 N.C. at 52 (quoting Foster, 197 N.C. at 191). However, gross negligence only requires a willful or wanton act, as opposed to a willful injury, the latter of which is the defining feature of an intentional tort. See Yancey, 354 N.C. at 53 ("An act or conduct moves beyond the realm of negligence when the injury or damage itself is intentional.").

In other words, "North Carolina law . . . require[s] a showing of intentional wrongdoing in order to sustain a claim of gross negligence." Rippy, 799 F.3d at 314. On the one hand, a claim of simple, or "ordinary" negligence rests on the assumption that the defendant "should have known the probable consequences of his act." Akzona, Inc. v. S. Ry. Co., 314 N.C. 488, 496 (1985); accord Ray v. N.C. Dep't of Transp., 366 N.C. 1, 13 (2012). On the other hand, gross negligence "rests on the assumption that [the defendant] knew the probable consequences [of his act], but was recklessly, wantonly or intentionally indifferent to the results." Akzona, 314 N.C. at 496 (quoting Wagoner v. N.C. R.R. Co., 238 N.C. 162, 168 (1953)); accord Ray, 366 N.C. at 13. Thus, a claim for "gross negligence" will lie where the defendant either deliberately or recklessly shirked his known duty.

Garcia v. United States, No. 4:15-CV-88-FL, 2016 WL 916432 (E.D.N.C. Mar. 10, 2016).

To avoid circularity in defining willful or wanton conduct for purposes of determining availability of punitive damages, it is necessary to disregard any references to the terms "willful" or "wanton" where those terms appear within the quoted definition of gross negligence. See Yancey; 354 N.C. at 52; Foster, 197 N.C. at 191. Stripped of such references, the notion of "gross negligence" that remains is an intentional act of conduct that works a breach of a known duty. See Akzone, 314 N.C. at 496. Accordingly, willful or wanton conduct is "more" than gross negligence in the sense that willful or wanton conduct requires, in addition to breach of a known duty, an aggravating factor. Indeed, N.C. Gen. Stat. § 1D-5(7) specifies that the pertinent aggravating factor

8

is the state of mind described in the statute as "conscious and intentional disregard of and indifference to the rights and safety of others."  In this manner, willful or wanton conduct lies between, on one hand, gross negligence, and, on the other, an intentional tort where the tortfeasor intends injury.  <u>Yancey</u>, 354 N.C. at 53.  Finally, where the case law defining gross negligence outside the context of punitive damages invokes various terms of disapprobation to describe willful or wanton conduct, such as "recklessness," 'deliberate violation of law," "free play of the will," and "wicked purpose," <u>see e.g.</u>, <u>Yancey</u>, 354 N.C. at 52; <u>Foster</u>, 197 N.C. at 191, to any extent those terms mean something other than "conscious and intentional disregard of and indifference to the rights and safety of others[,]" they do not survive application of N.C. Gen. Stat. § 1D-5(7) as part of any analysis relevant to determining availability of punitive damages.

In light of these principles, the court turns its address to application of law to the undisputed facts.

1. Claims Against Defendant Robinson

Plaintiffs have forecast evidence that defendant Robinson was speeding with cruise control set three miles per hour over the posted limit,  (<u>see</u> DE 7 ¶ 26 (posted speed limit was 65 miles per hour); Banks Dep., DE 44-2 at 57:21 ("[Robinson's] cruise control was set at 68"), failed to reduce speed despite defendant Greyhound's policy to reduce speed by 25% in adverse weather conditions, (DE 44-3 at 36:16–17 ("[O]ur standard is to decrease speed by 25 percent [in rainy weather].")); (DE 44-15 (video captured from dash showing rainy conditions)); and was driving while fatigued. (Warren Aff., DE 44-10 ¶¶ 3, 14).  For reasons that follow, this conduct evinces, at most, gross negligence.

Regarding defendant Robinson's driving speed, the court finds instructive Yancey v. Lea, wherein the North Carolina Supreme Court surveyed motor vehicle negligence cases and observed "that gross negligence issue has been confined to circumstances where at least one of three rather dynamic factors is present: (1) defendant is intoxicated; (2) defendant is driving at excessive speeds; or (3) defendant is engaged in a racing competition." 354 N.C. 48, 53–54 (2002) (citations omitted). The Yancey court cites with approval Baker v. Mauldin, wherein the North Carolina Court of Appeals observed that where "immediately prior to the accident defendant was driving 100 miles per hour[,] [t]his is some evidence to support plaintiff's allegation that defendant's conduct was willful and wanton."[1] 82 N.C.App. 404, 408 (N.C. Ct. App. 1986).

Applying the Yancey factors, it is undisputed that defendant Robinson was neither intoxicated nor engaged in a racing competition. Moreover, driving three miles per hour over the posted speed limit is not "excessive" in light of Baker. See id. Although a jury reasonably could find that Robinson was driving too fast for conditions and should have reduced speed by 25% in accordance with defendant Greyhound's policy, see (DE 44-3 at 36:16–21), such a finding fails to establish a basis from which a jury reasonably could infer willful or wanton conduct. That is, although Greyhound's policy to reduce speed by 25% in adverse weather conditions constitutes a sufficient basis for the jury to conclude that defendant was grossly negligent in driving too fast for conditions, see Akzona, 314 N.C. at 496, any further inference that, at some relevant time, Robinson deliberated about the rights of other motorists and made the "conscious and intentional" choice to disregard those rights and adopt an attitude of "indifference" toward them, must rest on speculation

---

[1] In context, the Baker court used the term "willful and wanton" as a synonym for "grossly negligent," where the issue of punitive damages was not before that court.

about Robinson's mental state that is not supported by any evidence of record. See Lovelace, 681 F.2d at 241.

This conclusion is bolstered where the record is devoid of any direct evidence, such as a statement by defendant Robinson, evincing conscious disregard for the rights and safety of others. The only circumstantial evidence of Robinson's mental state is Robinson's driving speed itself and the fact that, on plaintiff's view of the facts, it was raining. However, allowing the jury to infer from the facts constituting gross negligence that Robinson's mental state rose to the level of willful or wanton conduct would run afoul of the precept that willful or wanton conduct is "more" than gross negligence. See N.C. Gen. Stat. § 1D-5(7). Relatedly, any inference by the jury from observation of Robinson's driving speed to conclusion about Robinson's mental state would constitute an arbitrary judgment call, where the jury equally could find that Robinson's driving speed was the result of mere negligence rather than "conscious and intentional disregard of and indifference to the rights and safety of others." See id. In this manner, plaintiffs have proffered, at most, a mere scintilla of evidence that Robinson's conduct was willful or wanton, which is not a sufficient showing to support award of punitive damages under the pertinent "clear and convincing evidence" standard. See N.C. Gen. Stat. § 1D-15(b); see Scarborough, 363 N.C. at 721–22.

Second, regarding fatigue, although it is undisputed that defendant Robinson was driving in excess of his allowable hours under the 70-hour rule, there is no genuine dispute that Robinson's mathematical error, made 20 days before the accident, was the root cause of that violation. (DE 39 ¶ 6; DE 43 ¶ 6).[2] Certainly, mathematical error is no categorical excuse to violate the law.

---

[2] In their statement of material facts, plaintiffs concede only that Robinson "testified" that his violation of the 70-hour rule was caused by a mathematical error. (DE 43 ¶ 6). However, plaintiff proffers nothing to rebut Robinson's testimony or testimony of Smith, wherein Smith demonstrates the manner in which Robinson's error on December 4, 2014, led to his violation of the 70-hour rule on December 24, 2014. (See DE 44-3 at 44:9–25). In this manner, there

11

However, on the facts of this case, any inference that Robinson's mathematical error was part of a scheme to withhold recording 10 driving hours on December 4, 2014, to enable Robinson to drive three extra hours on December 24, 2014, while concealing the violation from Greyhound, all accompanied by Robinson's "conscious and intentional disregard of and indifference to the rights and safety of" other motorists, is entirely speculative. See Lovelace, 681 F.2d at 241. Therefore, plaintiffs' assertions of willful or wanton conduct cannot rest on this basis, either. See id.

Finally, plaintiffs proffer direct evidence that defendant Robinson was fatigued, independent of any violation of the 70-hour rule. In particular, by affidavit and deposition testimony, Warren describes his personal observation of Robinson's fatigue-related behavior before and during the December 24, 2014, drive. (See DE 44-10 ¶¶ 3, 14). Accordingly, if it credits Warren's testimony, a jury may find that Robinson was fatigued at the time of accident. Moreover, if Robinson was fatigued, the jury may infer that Robinson had actual knowledge of his own fatigue. Finally, the record contains sufficient evidence to support a finding that Robinson was trained by defendant Greyhound, and therefore knew, that driving while fatigued is not allowed. (See e.g., DE 40-7 at 12 (Greyhound "Stay Sharp" classroom materials directing fatigued drivers to "call dispatch and book off your assignment."); DE 39 ¶ 15 (Robinson had undergone his bi-annual "Stay Sharp" training . . .")). These facts support conclusion that Robinson intentionally drove the bus with knowledge that such action violated a duty to refrain from driving while fatigued, which conduct may amount to gross negligence. See Akzona, 314 N.C. at 496. However, for the same reasons pertinent to Robinson's violation of the 70-hour rule, Robinson's fatigue does not constitute clear and convincing evidence that Robinson's state of mind rose to the level of "conscious and

---

is no genuine dispute that Robinson's mathematical error caused his violation of the 70-hour rule. See Anderson, 477 U.S. at 24–48.

intentional disregard of and indifference to the rights and safety of others." See N.C. Gen. Stat. §§ 1D-5(7), 1D-15(b). That is, any theory that, prior to departure or during the trip, Robinson recognized his fatigue, deliberated about it, and consciously chose to disregard the safety of other motorists, is entirely speculative, and cannot survive a motion for summary judgment. See Lovelace, 681 F.2d at 241.

In sum, plaintiffs have not demonstrated the existence of a genuine dispute of material fact as to defendant Robinson's willful or wanton conduct; therefore, plaintiffs' prayer for punitive damages against Robinson cannot survive the instant motion. See Fed. R. Civ. P. 56(a).

2. Claims Against Defendant Greyhound

"Punitive damages may be awarded only if . . . in the case of a corporation, the officers, directors, or managers of the corporation participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages." N.C. Gen. Stat. § 1D-15(c). In certain cases, "a corporation may be subject to punitive damages based on a theory of direct liability where the corporation's acts or policies constitute the aggravating factor." Everhart v. O'Charley's Inc., 200 N.C. App. 142, 153 (N.C. Ct. App. 2009) (holding that corporate policy requiring restaurant manager to gather evidence for use in litigation prior to helping any injured or sick customer unless said customer is "convulsing, passed out on the floor" or "bleeding profusely" constituted basis for jury to conclude that such policy "recklessly disregards customers' safety and well-being in order to begin the process of protecting [the restaurant] against potential litigation.").

Here, the undisputed evidence establishes that neither defendant Greyhound's officers, directors, nor managers participated in nor condoned any willful or wanton conduct. As noted, none of defendant Robinson's conduct was willful or wanton, and, furthermore, Greyhound did not

13

condone even Robinson's negligent conduct. In particular, it is undisputed that Greyhound does not authorize drivers to exceed the posted speed limit, (DE 44-13 ("Buses are not to be operated in excess of the posted speed limit.")), it directs drivers to reduce speed further in rainy weather conditions, (Id.; DE 40-8 (instructing drivers to reduce speed in adverse weather)), and it does not permit drivers to violate the 70-hour rule nor drive while fatigued. (DE 40-7 at 12 ("If you are fatigued and cannot pull your assignment, call dispatch and book off your assignment.")). Although drivers who violate these are rules are not always subject to suspension, Greyhound may "coach" a driver who is known to speed or otherwise drive unsafely, and Robinson was so coached. (Pls.'s Br., DE 42 at 5). Accordingly, Greyhound did not condone any act of Robinson's negligent or grossly negligent conduct. See N.C. Gen. Stat. § 1D-15(c). Plaintiffs do not contend that Greyhound condoned anyone else's willful or wanton conduct, and the evidence of record supports no such theory. Accordingly, punitive damages are not available against Greyhound on this basis. See id.

 Plaintiffs also theorize that defendant Greyhound's officers, directors, or managers instituted inadequate procedures to prevent accidents, such that this failure demonstrates "conscious and intentional disregard for and indifference to the rights and safety of others." N.C. Gen. Stat. 1D-5(7). Indeed, hindsight discloses that Greyhound's procedures did not prevent the accident in issue here, and a reasonable jury could find that Greyhound was negligent by its failure to implement stricter procedures. See Martishius v. Carolco Studios, Inc., 335 N.C. 465, 473 (2002) ("Actionable negligence occurs when a defendant owing a duty fails to exercise the degree of care that a reasonable and prudent person would exercise under similar conditions, or where such a defendant of ordinary prudence would have foreseen that the plaintiff's injury was probable under the

circumstances.") (citations omitted). However, the evidence of record discloses no basis to conclude that any deficiencies in Greyhound's procedures were the result of its officers', directors', or managers' "conscious and intentional disregard of and indifference to the rights and safety of others[.]" N.C. Gen. Stat. § 1D-5(7). That is, any evidence of negligence by Greyhound's officers, directors, or managers does not support the further inference that such actors deliberated about the rights and safety of other motorists and chose "conscious[ly] and intentional[ly]" to disregard such rights. See id. Moreover, Greyhound's implementation of internal driving regulations and training procedures, inadequate though they may have been, demonstrates that Greyhound did take account of other motorists' safety, to at least some degree. Thus, Greyhound's failure to implement stricter procedures was not willful or wanton and does not support any award of punitive damages. See George, 210 N.C. App. at 207–8.

Plaintiffs argue that defendant Greyhound implemented no procedure at all to prevent violations of the 70-hour rule or driving at excessive speed. Plaintiffs note that Greyhound's procedures do not prevent a driver from exceeding the 70-hour rule upon accepting an extra route, (see Smith Dep., DE 44-3 at 66:25–671); nor does Greyhound "take proactive steps" to ensure that drivers receive sufficient sleep between shifts, (see id. at 95:8–96:4); nor does Greyhound have any procedure that makes it impossible for drivers to exceed the speed limit or drive too fast for conditions. Plaintiffs protest also that defendant Robinson was not subjected to stricter punishment, such as suspension, for his prior speeding and violations of the 70-hour rule. (See DE 44-2 at 73:14–16 (noting Robinson was not suspended for prior violations)). However, even accepting these facts as true, they do not support any inference that Greyhound participated in or condoned any willful or wanton conduct. That is, even if Greyhound's procedures are insufficient to eliminate

15

some risk, the evidence of record does not disclose any aggravating factor to distinguish such deficiency from mere failure to discharge that duty of reasonable care which underlies the tort of negligence.  See N.C. Gen. Stat. 1D-5(7).  Accordingly, defendants are entitled to summary judgment on plaintiffs' prayer for punitive damages against defendant Greyhound.

For these reasons, plaintiffs' prayer for punitive damages against defendant Greyhound is dismissed.

### CONCLUSION

For the foregoing reasons, defendants' motion for partial summary judgment is GRANTED. Plaintiffs' prayer for punitive damages, set forth in the third clam for relief and in paragraph three of the prayer for relief, is DISMISSED.  Where claims remain for trial, in accordance with the case management order entered May 12, 2016, the case now is ripe for entry of an order governing deadlines and procedures for final pretrial conference and trial.  The parties are DIRECTED to confer and file within 14 days from the date of this order a joint status report informing of 1) estimated trial length; 2) particular pretrial issues which may require court intervention in advance of trial, if any; and 3) three suggested alternative trial dates.  In addition, the parties shall specify if they wish to schedule a court-hosted settlement conference or additional alternative dispute resolution procedures in advance of trial, and if so the date for completion of such procedures.

SO ORDERED, this the 30th day of March, 2018.

_____
LOUISE W. FLANAGAN
United States District Judge